Joseph Jardine, USB No. 8889
Peter Goodall, USB No. 9718
**JARDINE LAW OFFICES, P. C.**
140 North Union Avenue, Suite # 205
Farmington, Utah 84025
E-mail: info@jlodefense.com
Telephone: 801/451-9555
Fax: 801/451-7581
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT,
IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ADAM CLOWARD, an individual, Plaintiff, v. AYMEE RACE, JOLAYNE (JODIE) SAMPSON, D. THORNTON, individually and in their official capacities as Unified Police Department employees; ROBERT NAYLOR, individually and in his official capacity as a Salt Lake County Animal Services employee; UNIFIED POLICE DEPARTMENT and SALT LAKE COUNTY ANIMAL SERVICES, political subdivisions of the state of Utah; and DOES 1-20, whose identities are currently unknown, Defendants. | **SECOND AMENDED COMPLAINT**  Case No. 2:20CV00165  JUDGE ROBERT SHELBY MAGISTRATE JUDGE DUSTIN B. PEAD |

Plaintiff, hereby complains against Defendants, and asserts the following allegations in their totality and in the alternative:

## PRELIMINARY STATEMENT

The following allegations are based upon the undersigned's understanding of information presently available. This is a civil rights action in which Plaintiff, Adam Cloward, seeks relief for Defendants' violations of his rights as guaranteed by the United States Constitution, specifically, the First, Second, Fourth, Fifth, Sixth and

1

Fourteenth Amendments, which are further secured by the Civil Rights Act of 1871, codified as 42 U.S.C. § 1983, § 1985 and§ 1988.

In the early evening of March 28, 2016, Cloward had let his pet chihuahua, Pika, out in the yard to use the bathroom at Cloward's Magna home, 8332 W. Aleen Ave. Cloward heard a disturbance and observed that a neighbor's Pitbull dog had come into the yard after Cloward's dog, Pika. Cloward quickly cracked the screen door open as the chihuahua ran squealing frantically up the steps into the house. Cloward returned outside as he had been in the process of working on a vehicle. Also, Cloward intended to investigate why the dog was loose, and whether the dog owner's gate had been left open and acted with intent to shoo the Pitbull home, as he had done numerous times before. The dog began walking toward its home but then abruptly turned on Cloward and charged him. Cloward retreated backward and yelled at the dog, "Kovu," to stop and go home. Kovu kept advancing, barking at Cloward. Cloward attempted to waive Kovu off with his baseball cap, but Kovu continued lunging forward. In fear, Cloward remembered he had his gun and reluctantly pulled the handgun from his hip holster and, as the dog lunged at Cloward, with teeth bared, Cloward reluctantly fired a single shot, directly downward striking the attacking Pitbull, behind its right ear.

The dog perished minutes later as a result.

Cloward immediately called 911 and reported that he shot a vicious pit bull that came after him. Defendant Unified Police Officers Aymee Race and Jolayne Sampson responded to investigate, as did Salt Lake Animal Services Officer Robert Naylor. With no suspicion Cloward had committed a crime, Race immediately detained and frisked Cloward, disarmed him of a firearm he told her was not used to shoot Kovu, and retained it through an hours-long investigation. At the conclusion of that investigation, Defendants Race and

2

Naylor determined that Cloward's conduct was justified. However, they requested that Cloward draft a more detailed witness statement.

Cloward declined to draft an additional statement until he had a chance to consult with an attorney. In response to Cloward's insistence upon his rights to counsel and against self-incrimination, Defendants Race, Naylor and Sampson initiated a felony prosecution against Cloward knowing that probable cause did not exist. They successfully coerced Cloward to provide an additional statement and then used the coerced statement to assert material discrepancies between his and others' accounts-there were none. Defendants Race and Sampson also seized Cloward's firearms without a legal basis, and in violation of the Second and Fourth Amendments to the United States Constitution. Defendants Race, Naylor, and Sampson ignored, destroyed, and refused to hear exculpatory evidence. All charges were dismissed against Cloward after several months of life-changing traumatic stress, hell, and legal proceedings Cloward was forced to go through. And after more than three-hundred nights of missed and/or disturbed sleep and significant and prolonged anguish and worry caused by this injustice. He has suffered significant injuries, including significant damage to his health and quality of life, thousands of dollars expended on attorneys, lost income, lost reputation, extreme emotional distress and fear of police officers, humiliation, loss of liberty and property, and deprivation of his constitutionally guaranteed rights. Furthermore, Cloward suffered the loss of his GI bill college funds. Cloward was so distressed by Defendants' false allegations, unjust prosecution, public vilification, and the fallout therefrom that he was forced to move away from his hometown of over 25 years out of fear of public reprisals and continued retaliation by Defendants. He has subsequently had to live his life in fear of the Unified Police Department.

3

## JURY TRIAL DEMAND

Cloward demands a trial by jury on every claim pleaded herein.

## PARTIES

1.        Plaintiff, Adam Cloward ("Cloward"), is a citizen of the United States and was a resident of Salt Lake County, State of Utah, at the time of the events giving rise to this action.

2.        Defendant, Unified Police Department, is a political subdivision of the State of Utah.

3.        Defendant Salt Lake County Animal Services is a political subdivision of the State of Utah

4.        At all relevant times, Defendant, Aymee Race ("Race"), was employed as a police officer for the Unified Police Department and, at all times alleged in this Complaint, Race was acting in the course and scope of her employment and under the color of law. Cloward is suing Race in her individual and official capacities.

5.        At all relevant times, Defendant, Jolayne Sampson ("Sampson"), was employed as a police officer for the Unified Police Department and, at all times alleged in this Complaint, Sampson was acting in the course and scope of her employment and under the color of law. Cloward is suing Sampson in her individual and official capacities.

6.        At all relevant times, Defendant, D. Thornton ("Thornton"), was employed as a police officer for the Unified Police Department and, at all times alleged in this Complaint, Thornton was acting in the course and scope of his or her employment and under the color of law. Cloward is suing Thornton in his or her individual and official capacities.

7.        At all relevant times, Defendant Robert Naylor ("Naylor") was employed as a

4

police officer for Salt Lake County Animal Services and, at all times alleged in this Complaint, Naylor was acting in the course and scope of his employment, and under the color of law. Cloward is suing Naylor in his individual and official capacities.

8.          At all relevant times, upon information and belief, Defendants Does 1-20 were employed by Unified Police Department, Salt Lake County Animal Services, or other political subdivisions of the State of Utah. At all times relevant to this Complaint, Does 1-20 were acting within the course and scope of their employment with these government agencies and under the color of law. Cloward is suing these Defendants in their individual and official capacities.

## JURISDICTION AND VENUE

9.           This action arises under the First, Second, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983, 1985 and 1988. Accordingly, the Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

10.        The claims made in this Complaint occurred and arose in Salt Lake County, State of Utah. Accordingly, venue is proper under 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

11.        Plaintiff, Adam Cloward, is a veteran of the United States armed forces, honorably discharged, and is an expert in the field of firearms safety.  Cloward is an avid outdoorsman, an expert marksman, and he earned a marksmanship medal during his military service.

12.        On the early evening of March 28, 2016, Cloward was at his family's Magna home working on a vehicle in the driveway.

13.        Cloward went in the house to wash his hands and then let his family's

chihuahua, ("Pika"), out in the yard to use the bathroom.  Cloward heard a disturbance and observed a neighbor's Pitbull, ("Kovu"), had come into the Clowards' yard after the chihuahua.

14.	Kovu chased after Pika, who turned back toward the home, and Cloward scooted Pika back into the home of his mother, Dorthy Cloward ("Dorthy Cloward").

15.	Cloward had witnessed Kovu running at large in the neighborhood in recent months, and he and other neighbors had shooed and herded Kovu home several times before.

16.	Cloward walked out the back door of the home and spotted the dog again, now running across the street into a neighbor's yard.  Cloward attempted to shoo the dog back in the direction of its owners' home by clapping his hands and telling the dog to "Go home!"

17.	Cloward had successfully herded Kovu home on several prior occasions; on those occasions, the dog kept its distance and never came within arms-reach.

18.	Initially, the dog, Kovu, ran toward its owners' home, approximately 220 feet north of the Clowards' home.

19.	With Kovu more than 100 feet away from Cloward, Kovu turned around and charged Cloward.

20.	Cloward attempted to shoo Kovu back, but Kovu continued charging while barking and growling.

21.	As Kovu charged closer to Cloward, Cloward turned around to walk back toward his home, but Kovu kept charging, lunging closer and closer.

22.	Cloward turned toward Kovu and, while walking backward away from Kovu, Cloward took off his hat and waived it at Kovu and yelled at Kovu to "Go home!"

23.      Kovu continued charging Cloward and, within several feet, Kovu lunged toward Cloward.

24.      As Kovu lunged toward Cloward, teeth bared, Cloward pulled his firearm from his waist holster and, unable to fully extend his drawing arm, fending off the dog with the barrel of the gun, fired a single shot directly downward at the attacking dog.

25.      The round Cloward fired struck the attacking dog.

26.      Kovu was hit behind its right ear.

27.      Kovu landed on Cloward's legs and feet as Cloward stumbled backward, almost having to fire a second shot to stop the attack as the dog continued to bite at him.

28.      Kovu, the attacking pit bull, soon died of the single gunshot wound.

29.      Cloward immediately called 911 and reported that a ferocious Pitbull had come after him, that he couldn't get away from the dog, and he had to shoot it.

30.      Defendant, Aymee Race ("Race"), a police officer employed by the Unified Police Department, was the first officer to arrive on the scene.

31.      Upon arrival, Race asked who shot the dog, and Cloward raised his hand.

32.      Race asked Cloward if he was carrying a firearm, and he said yes that he had a little spare gun on him but clarified it was not the firearm he used to shoot Kovu.

33.      Without asking or receiving permission, Race conducted a pat-down search of Cloward, and she removed a .380 caliber handgun from his waistband.

34.      Race advised Cloward she was going to put his .380 handgun in her vehicle while she assisted animal control in their investigation, and Cloward complied.

35.      Cloward told Race that he placed the firearm used to shoot Kovu, a larger 9 mm pistol, in the home on the kitchen table while he waited for police to arrive.

7

36.        Race reported that she interviewed Cloward and neighbor boys G.S. and A.S., ages unknown.

37.        A.S. provided a handwritten witness statement, stating:

"I was clenang wene I toke a drack and looked out the window and saw covou run on the [illegible] yard then adam cam out of his house and triyd to scare covou back to his house and yelled at him to go home and covou started barcking at him so he startedwocing backward andthen covoumoved-tordhim and adam puld the gun out and fierd at covou and then said stoped piece of shit." [*sic*].

38.        G.S. provided a handwritten witness statement, which stated:

"The dog (Kofu) got out side and adam saw so he yelled at the dog to go home and so it barcked at him he walked back the dog walked forward so he took out his pistol and the dog barked and he shot the dog ant it was alive intel the copes got there. then he said stupid fucking dog." [*sic*]

39.        Cloward's mother, Dorthy Cloward, along with other neighbors who knew that Kovu regularly roamed at large and behaved aggressively, attempted to speak to Race, but Race admonished them to go back to their homes and stay there.

40.        Race assisted Defendant Robert Naylor, a Salt Lake County animal control officer, who led the investigation.

41        Based on witness statements and physical evidence, Naylor determined that Kovu had charged Cloward and Cloward was justified in shooting the at large Pitbull, Kovu.

42.        Naylor and Race went to Cloward's home and told him that they had concluded he was justified in shooting Kovu and that Kovu's owner would be cited.

43.        Naylor and Race told Cloward that his written statement was vague and that they wanted him to provide another written statement.

8

44.          After informing Cloward they wanted him to draft an additional written statement, Race returned to Cloward his .380 handgun.

45.          At the time Naylor and Race asked Cloward for a more detailed statement, the 9 mm handgun that Cloward used to shoot Kovu remained in the home on the kitchen table.

46.          Upon Race returning to Cloward his .380 handgun, Cloward holstered the firearm.

47.          Cloward then advised Race and Naylor that he would prefer to consult with an attorney before providing an additional statement.

48.          Race and Naylor insisted that Cloward needed to provide another statement. and Cloward continued to assert that he had a right to be represented by counsel and to not provide evidence against himself.

49.          Race and Naylor told Cloward it was suspicious he would. not provide an additional statement, and they would not issue a citation to Kovu's owner unless Cloward provided the additional statement, and they would have charges screened against Cloward if he did not provide the additional statement.

50.          Race and Naylor departed Cloward's home, and Cloward immediately phoned dispatch and inquired about his rights, particularly if he was required to provide an additional statement.

51.          Cloward was ultimately connected by phone to Sampson, who told Cloward that Race is a good police officer, and Sampson and Cloward argued over whether Cloward should be forced to provide an additional statement, whether Cloward's gun was lawfully seized, and whether Kovu's owner should or should not be cited depending upon whether Cloward provided an additional written statement.

52.        Sampson told Cloward she was on her way to the scene and ended the phone call.

53         While Sampson was *en route* to the scene; Sampson, Race and Naylor determined to seize Cloward's firearms, and to have his concealed carry permit revoked by the Bureau of Criminal Identification, because Cloward "had called into dispatch several times," according to Naylor's report of the incident.

54.        When Sampson arrived, she approached Cloward and ordered Cloward to provide an additional statement.

55.        Due to Defendants' threats, Cloward provided an additional written statement.

56.        When Cloward provided the more detailed statement to Sampson, she looked at it briefly, and stated, "So you changed your statement?"

57.        Cloward responded, "No, I didn't," and Sampson stated, "Yes you did, and we're going to charge you with animal cruelty."

58.        Sampson then advised Cloward that police were going to take his firearms.

59.        Cloward protested, stating that police were violating his right to bear arms, and that they coerced his second statement despite his request for counsel.

60.        Sampson told Cloward to be quiet and go back into his home, or she would take him to jail. Cloward complied, telling Sampson he would see her in court. Sampson scoffed at Cloward and told him to shut up and go in his house or she would take him to jail.

61.        Sampson returned to the Cloward home later on the evening of the incident and spoke to Cloward's parents Dorthy and Ray Cloward.

62.        Dorthy and Ray Cloward attempted to explain to Sampson that Kovu was a regular nuisance in the neighborhood, and that Cloward was an animal lover who would

never hurt a dog unless he was forced to.

63.         Sampson ignored statements by Dorthy and Ray Cloward, insisted that Cloward was guilty of animal cruelty, and attempted to elicit incriminating information about Cloward.

64.         Sampson insisted Cloward suffered Post Traumatic Stress Disorder due to his military service, and she stated to the Cloward's that's why Cloward shot the dog.

65.         Race ignored and shooed away at least one other witness who attempted to tell Race that Kovu was known in the neighborhood to run loose and behave aggressively toward animals and people.

66.         Witness and neighbor Amanda Trujillo approached Race intending to report that Kovu had aggressively charged her earlier that day, forcing Trujillo to seek safety in her truck, but Race instructed Trujillo not to speak to her.

67.         Trujillo also intended to report to Race that Cloward was a dog-lover and had routinely rounded up strays and dogs-at-large in the neighborhood to ensure their safety and the safety of local residents and also had never shot the Trujillo's large Pitbull dog and regularly gave it love and treats.

68.         Sampson did not apparently draft a report of the incident or her part in the investigation, as no such report was provided to Cloward through discovery in his criminal case.

69.         Even after Cloward was vilified in local press accounts of the incident, upon information and belief, Sampson, Race, Naylor, and Thornton made no efforts to conduct additional investigation.

70.         Had Defendants Sampson, Race, Naylor, or Thornton conducted a thorough investigation, they would have learned from additional neighbors Cathy Baldonado and James

Pappas that Kovu had been at large and had also charged and menaced them and other neighbors frequently during the preceding months and that they were in fear of the dog.

71.     Race noted in her report she found it odd that she did not see a shell casing near the animal's body.

72.     Shell casings are ejected from firearms at unpredictable trajectories and distances.

73.     Weather conditions on March 28, 2016, were wet and snowy with water running in the gutter near the scene.

74.     Race did not report having searched for a shell casing nor asking any other officers to assist her in a search and, upon information and belief, she did not.

75.     Race did not report having summoned a crime scene technician to search for the shell casing with a metal detector, as is customary in shooting investigations and, upon information and belief, Race did not do so.

76.     Race did not ask, or apparently even care to ask, Cloward about the shell casing. Yet, none the less secretly conspired to compile her false allegations in this regard.

77.     Race did not report having asked anyone else about a shell casing and, upon information and belief, she did not.

78.     Race did not report having determined how many rounds remained in Cloward's 9 mm handgun. and, upon information and belief, she did not.

79.     Cloward called police, admitted he shot Kovu, and provided police the firearm he used.

80.     Cloward did not hide or dispose of any shell casing.

81.        Cloward had no self-serving motive to hide or dispose of a shell casing.

82.        Race, Sampson, Naylor and others unknown permitted the destruction of exculpatory evidence by allowing Kovu's owner to take the animal without having the dog subject to a necropsy or any other forensic tests to determine the trajectory of the round fired or the Pitbull's proximity to Cloward at the time he shot the dog.

83.        Race did not document the exit wound from Kovu's throat, which would have shown conclusively that Cloward fired directly downward at the attacking dog.

84.        On the evening of the incident, Cloward called the police and implored the watch commander to not destroy the body of the dog. Yet, Defendants nonetheless allowed Kovu to be destroyed.

85.        Kovu's body would have shown that the round was fired at or near point-blank range.

86.        Cloward made no materially inconsistent statements to police.

87.        In calls to police dispatch, Cloward stated that the dog would not go home like before, that the dog was coming after him, Cloward could not get away from the dog and it was going to bite Cloward when he was forced to shoot it to avoid injury.

88.        In his initial written statement, Cloward stated that the pit bull came toward him viciously and aggressively and he shot it as a result.

89.        In his second written statement, Cloward stated that the loose Pitbull tried to bite him, and he shot it.

90.        Whether Cloward was walking his dog is irrelevant to whether he committed the offenses Defendants investigated and that were ultimately charged.

91.        From the juncture in her report that Race noted Cloward declined to provide

13

a more detailed statement, Race's report became highly derogatory toward Cloward, stating he was being "unstable," "irate," and "chang[ed] his story several times," none of which was true.

92.        Significantly, Race, Sampson, Naylor, and Thornton did not cite Cloward for, or suggest that he committed, any number of offenses related to providing false statements to police under the bevy of Utah Code provisions prohibiting such conduct.

93.        Defendants Race, Sampson, Naylor, Thornton and others unknown caused Cloward's prosecution for Felony Discharge of a Firearm, a third-degree felony under Utah Code section 76-10-508.l (2014); Aggravated Cruelty to an Animal, a class A misdemeanor under Utah Code subsection 76-9-301(4); and Tampering with Evidence, a class A misdemeanor under Utah Code section 76-8-510.5.

94.        Defendants Race, Sampson, Naylor, Thornton, and others unknown caused a warrant to issue for Cloward's arrest.

95.        Cloward surrendered himself to the Salt Lake County Adult Detention Center, where he was booked, strip searched, humiliated, verbally abused, hand cuffed to a pipe for several hours, and held in filthy conditions, before being fingerprinted and having DNA samples taken under threats of force. before being finally released hours later upon posting a $5,000 bail bond using the funds he was saving for his continued education.

96.        All evidence known to Defendants indicated Cloward fired a single round at a downward angle toward Kovu, a Pitbull, whereas section 76-10-508.1 requires proof the actor discharged a weapon in the direction of a person, habitable structure, or vehicle.

97.        All evidence indicated Cloward's intent in firing the weapon was to shoot the attacking dog whereas section 76--10--508.1 requires proof the actor either: knew or had

reason to believe a person may be endangered by the discharge of the firearm; intended to intimidate or harass another or damage a habitable structure.

98.        No evidence indicated another person was present on the street, let alone present in the line of fire, when Cloward fired directly downward at Kovu.

99.        No evidence indicated Cloward discharged his firearm with the intent to harass or intimidate any other person.

100.        Section 76-10-508.l is inapplicable when the person who discharges the firearm "is in lawful defense of self or others."

101.        Similarly, a conviction under section 76-9-301(4), the animal cruelty statute, requires proof that the person tortured an animal, administered a poison to an animal, or killed an animal without a legal privilege to do so.

102.        No evidence suggested Cloward tortured or poisoned the dog.

103.        Cloward enjoyed numerous legal privileges to defend himself against the out of control, attacking dog.

104.        Cloward enjoyed numerous legal privileges to pursue and kill Kovu.

105.        Kovu was at the time of its death an at-large pit bull.

106.        Kovu immediately prior to its death advanced toward Cloward.

107.        Kovu immediately prior to its death barked at Cloward.

108.        Kovu immediately prior to its death bared its teeth at Cloward.

1.09.        Kovu immediately prior to its death attempted to bite Cloward.

110.        Kovu was known to Cloward's neighbors in the days, weeks and months prior to its death to be increasingly aggressive when roaming the neighborhood.

111.        Kovu was known to Cloward in the days, weeks and months prior to its death to

15

be increasingly aggressive when roaming the neighborhood.

112.        On the day of Kovu's death, a "Beware of Dog" sign hung on the chain-link fence at Kovu's owners' home.

113.        Cloward was aware of the "Beware of Dog" sign hanging on the chain-link fence at Kovu's owners' home for months preceding Kovu's death.

114.        Mere moments before Kovu's death, Kovu had come after the Cloward's family pet, a chihuahua named Pika.

115.        Mere moments before Kovu's death, Cloward directed Pika into Cloward's home.

116.        Mere moments before Kovu's death, Pika's body shook uncontrollably inside Cloward's home.

117.        Cloward observed and interpreted Pika's uncontrollable shaking to be a result of Pika having been frightened and or injured by Kovu.

118.        Dorthy Cloward observed and interpreted Pika's uncontrollable shaking to be a result of Pika having been frightened by Kovu.

119.        Utah Code provides in part that "[a]ny person may injure or kill a dog while: (1) the dog is attacking, chasing, or worrying: (a) a domestic animal having a commercial value" or "(3) the dog is being pursued for committing an act described in Subsection (1) "Utah Code §§ 18-1-3(1)(a)(3).

120.        Salt Lake County Code provides. In part that: "Any person may kill .an animal while it is committing any of the acts specified in [Salt Lake County Code § 8.04.180(A)] or while such animal is being pursued thereafter or to protect him/herself, or members of the public from any threat of death or personal injury then being posed by the

animal." Salt Lake County Code§ 8.04.180(D).

121.         Lethal force against an animal in Salt Lake County is explicitly authorized in
part when animals "attack, chase or worry any human, domesticated animal or any pet or
companion animal." Salt Lake County Code§ 8.04.180(A). "Worry" means "to harass or
intimidate by barking or baring of teeth, growling, biting, shaking, or tearing with the teeth;
or approaching any person in an apparent attitude of attack or any aggressive behavior
which would cause a reasonable person. to feel they were in danger of immediate physical
attack." *Id.* The pit bull posed a threat of death or personal injury to Cloward when
Cloward shot it. at point-blank range to prevent from being bitten.

122.         Utah Code explicitly authorized Cloward to pursue and kill Kovu if the pit
bull so much as chased or worried Cloward's family pet, Pika.

123.         Salt Lake County Code explicitly authorized Cloward to pursue and kill
Kovu if the Pitbull so much as worried Cloward or his pet, Pika, as the term "worry" is
defined under Salt Lake County Code.

124.         No evidence known to Defendants at the time of instigating Cloward's
prosecution contradicted Dorthy Cloward's statement made under penalty of perjury that
Kovu chased the Cloward family chihuahua while it was relieving itself, that Cloward then
scooted Pika back into the home, and that Pika was shaking uncontrollably.

125.         Four uncontroverted eyewitnesses, Cloward, his mother, A.S., and G.S.,
swore in written statements that, far from seeking to confront or hurt Kovu, Cloward attempted
to shoo Kovu back to his home, as he'd done on numerous prior occasions.

126.         Three uncontroverted eyewitnesses-Cloward, A.S., and G.S.-swore in
written statements. under penalty of perjury that Kovu advanced toward Cloward, Kovu was

17

barking at Cloward, and that Cloward was retreating when he drew the gun and shot Kovu.

127.        No evidence contradicts Cloward's sworn statements that Kovu was within two feet of Cloward when Cloward drew a firearm and fired a single downward shot, which is also confirmed by the entry wound on top of the dog's head behind its ear.

128.        No evidence contradicted Cloward's belief that Kovu was attacking him when he fired.

129.        In two written statements given to police, and in a recorded 911 call, Cloward's accounts of what happened are consistent in every material respect.

130.        Cloward's second written statement was given under duress, including the threat of prosecution, after Cloward had requested the assistance of counsel prior to giving an additional statement.

131.        Race reported that Cloward's written statements were inconsistent because at some point she claimed that he had stated that he was walking his family's chihuahua Pika when Kovu approached them.

132.        Whether Cloward was walking his dog or not was irrelevant to whether he was justified in shooting Kovu, or whether Kovu worried him or his pet.

133.        Nonetheless, if Cloward stated to Race that he was walking his dog, that statement is wholly consistent with Cloward walking his dog into the yard to allow it to relieve itself. Further Cloward denies and refutes in full Race's baseless and false affirmations in this regard.

134.        In determining to charge Cloward, Race also reported that Cloward "had in fact been able to get away from the pit bull but went back towards the pit bull."

13-5.        Under Utah Code and Salt Lake County Code Cloward had no duty to retreat

18

from the at-large Pitbull, but he was in fact explicitly authorized to pursue and kill Kovu under the circumstances.

136.          Race, Sampson, Naylor, and Thornton acted with malice.

137.          Race fabricated a pretext for changing her recommendation that the shooting was justified to unjustified.

138.          Sampson arrived at Cloward's home and spoke to his parents and insisted that Cloward shot Kovu because Cloward suffers from PTSD.

139.          Upon information and belief, Sampson did not document any of her investigative actions or findings in a police report, as required by UPD policy.

140.          Sampson stated to an animal control officer that she was *en route* to the scene, and she intended to confiscate Cloward's firearms, and to contact the Utah Bureau of Criminal Identification to have Cloward's concealed carry permit revoked, because Cloward had repeatedly called dispatch to protest his treatment.

141.          Naylor cited Cloward under the very Salt Lake County ordinance that justified Cloward's conduct.  Naylor rescinded the citation he had already given to Kovu's owner for having a dog at large, and Naylor did so only after Cloward exercised his rights to protest his treatment by police and insist he not be compelled to give an additional statement without the assistance of counsel.

142.          Upon information and belief, Sampson, Race, Naylor, and Thornton, ignored or discounted all evidence pointing to Cloward's justification in shooting Kovu.

143.          Defendant Thornton drafted the following materially false and misleading probable cause statement, which resulted in charges being filed against Cloward:

Your declarant bases this Information on the following:

19

The statement of Unified Police Officer Race, that on or about March 28, 2016, she responded to the report that a male suspect had shot a dog at 8332 West Aleen Avenue, Salt Lake County. The male was identified as ADAM CLOWARD. CLOWARD told Officer Race that he was walking his chihuahua, and a pit-bull advanced towards him, was barking, and got right next to his leg, and he shot him. CLOWARD stated that he is familiar with the pit-bull, and that he has been a commonly known nuisance in the neighborhood. Officer Race asked CLOWARD for a more detailed statement, and he refused, and then later provided a second written statement and changed his story and said that he shot the dog when he was trying to bite him. Officer Race observed that all the shell casings that should have been where the dog was shot had been picked up.

The statement of Dorthy Cloward, that CLOWARD took their dog out and that a pit bull came after them. CLOWARD brought the chihuahua back to Dorthy, and then went to shoo the pit bull home.

The statement of minors, A. S. and G.S., that they saw CLOWARD in his driveway and that he did not have his chihuahua with him. CLOWARD went from his driveway to the neighbor's yard across the street, and began to tell the dog to go away. A.S. and G.S both saw the pit-bull going back to his yard. They saw the dog was barking, and come back towards CLOWARD, and he shot the dog. A.S. and G.S. state that they are familiar with the pit-bull, and that his bark was a friendly bark, not a mean one. After CLOWARD shot the dog, he called it a "stupid piece of shit", and a "stupid fucking dog".

144.        Although Thornton's probable cause statement was materially false, and grossly misleading, it still did not give rise to probable cause that Cloward committed any of the charged

offenses.

145.     Upon information and belief, Sampson, Race, and Naylor ignored or shooed away witnesses who attempted to tell them that Kovu was known in the neighborhood to be aggressive and frequently at-large.

146.     Witness and neighbor Amanda Trujillo approached Race to report that Kovu had aggressively charged her earlier that day, forcing Trujillo to seek safety in her truck, but Race ordered Trujillo to not speak.

147.     Trujillo also would have told Race that Cloward was a dog lover and had routinely rounded up strays and dogs-at-large in the neighborhood to ensure their safety and the safety of local residents.

148.     Even after Cloward was vilified in the local press, upon information and belief, Defendants' Race, Sampson, Naylor, and Thornton conducted no follow-up investigation.

149.     Had Defendants investigated further, upon information and belief, they would have learned that Kovu had earned a reputation in the neighborhood for running at large and menacing residents and their pets, including earlier on the very day that Kovu attacked Cloward.

150.     Race omitted from her report that a "Beware of Dog" sign was prominently displayed on the fence of the home where Kovu lived.

151.     Race and Sampson closed their eyes, to the facts, and permitted the destruction of key exculpatory evidence, specifically the very subject Kovu, whose necropsy would have shown the defensive downward trajectory of the single round Cloward fired.

152.     As a direct and proximate result of Defendants' unlawful and unconstitutional conduct, Cloward has suffered extensive injuries, including a resulting diagnosis of PTSD; lost income; and productivity, fees expended on attorneys to defend

21

against Defendants' malicious allegations and to retrieve his unconstitutionally-seized firearms; damage to his reputation; public and private hostility; moving expenses, financial devastation, the loss of his opportunity to start and have a family. (Cloward was compelled to moved away from his hometown of over twenty-five years. out of fear of reprisals from Defendants and due to the damage done to his reputation); alienation from family and other loved ones; and the violation of his rights under the First, Second, Fourth, Fifth, and Fourteenth amendments to the United States Constitution.

## FIRST CAUSE OF ACTION

### UNCONSTITUTIONAL WARRANTLESS DETENTION

(Under 42 U.S.C. § 1983 in violation of the Fourth Amendment against Defendants Race, Sampson, and Naylor)


153.        Cloward incorporates by reference and restates all preceding allegations.

154.        The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures, and the Fourth Amendment is incorporated against the states by the Fourteenth Amendment.

155.        Under the Fourth Amendment, police officers may not conduct even a brief *Terry* stop without reasonable suspicion that the person being detained for questioning is involved in criminal activity.

156.        Defendants Race and Sampson lacked reasonable suspicion to believe Cloward had committed a crime upon Race's arrival, and at all times during the investigation and detention of Cloward.

157.        From the time Cloward called police at approximately 1644 hours until Race

22

arrived on scene approximately seven minutes later, all information known to police indicated Cloward acted lawfully.

158.     Race nonetheless detained Cloward, frisked him, and seized a firearm from his waistband that she knew was not used to shoot the dog.

159.     Race continued to detain Cloward for the duration of her investigation.

160.     Race eventually released Cloward and returned his firearms to him, only to again seize him and his firearms and resume the detention by threatening to charge him if he did not provide an additional written statement.

161.     Defendant Sampson participated in and continued the detention by seizing Cloward's firearms and ordering him to return to his home or be arrested.

162.     Upon information and belief, Defendants Race, Sampson, and Naylor, detained Cloward for nearly three hours.

163.     This detention constituted a de facto arrest requiring probable cause;

164.     Defendants lacked reasonable articulable suspicion to detain or probable cause to arrest Cloward, and closed their eyes to the facts and exculpatory evidence.

165.     Defendants, while acting under color of state law, violated Cloward's clearly established right to be free from unreasonable seizure by unconstitutionally detaining and arresting him for several hours, and by seizing his firearms without a warrant or any other warrant exception.

166.     Defendants Race, and Sampson even in a supervisory position, and Naylor, as well as others, had the duty and opportunity to intervene to prevent Cloward's unconstitutional seizure, and deprivation of his property, but they failed to intervene in violation of Cloward's right to be free from unreasonable searches and seizures.

167.        Accordingly, Cloward requests relief in the form of a declaration that these Defendants violated Cloward's rights under the Fourth Amendment, all damages resulting as a direct and proximate result of these Defendants' violations of Cloward's Fourth Amendment rights, costs, attorney's fees, and all other relief the Court deems just and equitable.

## SECOND CAUSE OF ACTION

### SUCCESSFUL RETALIATORY INDUCEMENT TO PROSECUTE

(Under 42 U.S.C. § 1983 in violation of the First, Second, Fifth, Sixth, and Fourteenth Amendments against Defendants Race, Sampson, Naylor, Thornton and others unknown)

168.        Cloward incorporates by reference and restates all preceding allegations.

169.        Successful retaliatory inducement to prosecute is proven when a person engages in constitutionally protected activity, the defendant caused the person an injury that would chill a person of ordinary firmness from continuing to engage in the protected activity, and the defendant's actions were substantially motivated as a response to the protected conduct.

170.        Cloward engaged in constitutionally protected activity under the First, Second, Fifth and Sixth Amendments by carrying and using a firearm, verbally protesting his treatment by Defendants, questioning whether Defendants were violating his civil rights, refusing to provide evidence against himself, and requesting an attorney before providing an additional statement.

171.        The rights to keep and bear arms, verbally protest police conduct, refuse to provide self-incriminating statements, and to have assistance of counsel during police

24

questioning were clearly established by the time of the events at issue here.

172.	Defendants Race, Sampson, Naylor, Thornton, and others unknown caused Cloward's prosecution for Felony Discharge of a Firearm, a third-degree felony under Utah Code section 76-10-508.1 (2014); Aggravated Cruelty to an Animal, a class A misdemeanor under Utah Code subsection 76-9-301(4); and Tampering. with Evidence, a class A misdemeanor under Utah Code section 76-8-510.5.

173.	Defendants Race, Sampson, Naylor, Thornton, and others unknown caused a warrant to issue for Cloward' s arrest.

174.	Upon learning the warrant had issued, Cloward surrendered himself to the Salt Lake County Adult Detention Center, where he was booked held for several hours and finally released after posting a $5,000 bail bond.

175.	The prosecution terminated in Cloward's favor with a dismissal of all charges in Utah's Third District Court Case No. 161904728 on August 18, 2016.

176.	No probable cause justified Cloward's arrest and prosecution for any of the offenses charged by information.

177.	Defendants Race, Sampson, Naylor, Thornton, and others unknown pursued Cloward's prosecution in retaliation for his protected conduct.

178.	A person of ordinary firmness would be chilled to engage in Cloward's protected conduct, inasmuch as Cloward did provide an additional statement against his will, and he was punished for exercising his various rights by being cited, charged and prosecuted, pilloried in the press, having his firearms seized and his right to carry a concealed firearm revoked, having an arrest warrant issued, being booked into jail, posting a $5,000 bail bond, and having his DNA taken.

179.        Defendants Race, Sampson, Naylor, and Thornton had the duty and opportunity to intervene to prevent Cloward' s unconstitutional retaliatory prosecution, but they failed to intervene in violation of Cloward's right to be free from retaliation for exercising his constitutional rights.

180.        Accordingly, Cloward requests relief in the form of a declaration that these Defendants violated Cloward's rights under the First, Second, Fifth, Sixth, and Fourteenth amendments; all damages resulting as a direct and proximate result of these Defendants' violations of Cloward' s articulated rights; costs; attorney's fees; and all other relief the Court deems just and equitable.

### THIRD CAUSE OF ACTION

#### UNCONSTITUTIONAL SEIZURE OF FIREARMS

(Under 42 U.S.C. § 1983 in violation of the Second Amendment and Fourth Amendment against Defendants Race, Sampson, UPD, and others unknown)

181.        Cloward incorporates by reference and restates all preceding  allegations.

182.        Cloward enjoyed the right to keep and bear arms under the Second Amendment, and the right to be secure in his effects against unreasonable searches and seizures under the Fourth Amendment.

183.        Defendant Race lacked reasonable suspicion to believe Cloward was armed and dangerous or suspected in a crime to justify frisking Cloward or seizing any weapons discovered.

184.        Defendant Race nonetheless frisked Cloward and initially seized Cloward's .380 handgun, which he had holstered, but which was not the firearm used in shooting Kovu.

26

185.        Defendant Race later seized as evidence the firearm Cloward used to shoot Kovu, the 9 mm, which Cloward had placed on the kitchen table in his home.

186.        Defendant Race returned both firearms to Cloward after determining his shooting of Kovu was justified.

187.        It was only after Cloward declined to provide an additional written statement without the presence of counsel that Defendants Race and Sampson determined to cite him and seized the .380 firearm, which was not involved in the shooting of Kovu, and the 9 mm, handgun, which was then inside Cloward's home on the kitchen table.

188.        Prior to arriving to the investigation scene, Defendant Sampson stated that she intended to seize Cloward's firearms, and that she intended to have Cloward's Utah Department of Public Safety-issued concealed-carry firearms permit summarily revoked.

189.        Cloward was deprived of his .380 firearm, and his 9mm firearm, until he retrieved them from Unified Police evidence on or about August 19, 2016, the day after charges were dropped against Cloward in Case No. 161904728.

190.        Defendant Race noted in her report that the firearms seized had rounds loaded in their chambers, and she asserted "As required by law, CCW carriers cannot have a round in the chamber." In fact, Utah Code subsections 76-10-523(2)(a) and 76-10-504(2) permit concealed carry permit holders to carry loaded firearms.

191.        Utah Code subsection 77-7-9 states: "[a]ny person making an arrest may seize from the person arrested all weapons which he may have on or about his person."

192.        Utah Code subsection 77-7-17 states: "[a] peace officer who finds a dangerous weapon pursuant to a frisk may take and keep it until the completion of the questioning, at which time he shall either return it if lawfully possessed, or arrest such person."

27

193.         Cloward, through then-counsel David White, attempted to retrieve the .380 caliber firearm from UPD evidence, but he was rebuffed, being erroneously told that the firearm was being held as evidence for purposes of the criminal prosecution.

194.         No exception to the warrant requirement permitted Defendants' seizure of the firearm not involved in the shooting of Kovu, and Defendants did not obtain a warrant.

195.         No probable cause justified seizure of Cloward's 9mm handgun as evidence either, inasmuch as Defendants determined Cloward's conduct was justified.

196.         Defendants Race, Sampson, and Naylor, had the duty and opportunity to intervene to prevent the unconstitutional seizure of Cloward's firearms, but they failed to intervene in violation of Cloward's Second Amendment right to keep and bear arms and his Fourth Amendment right to be free from unreasonable searches and seizures.

197.         By unlawfully and unconstitutionally seizing Cloward's firearms, Defendants are liable to Cloward for violation of his Second Amendment right to keep and bear arms, and his Fourth Amendment right to be free from unreasonable searches and seizures of his property.

198.         Accordingly, Cloward requests relief in the form of a declaration that these Defendants violated Cloward's rights under the Second and Fourth amendments; all damages resulting as a direct and proximate result of these Defendants' violations of Cloward's articulated rights, costs, attorney's fees, and all other relief the Court deems just and equitable.

## FOURTH CAUSE OF ACTION

### VIOLATION OF DUE PROCESS, "STIGMA-PLUS" CLAIM

(Under42 U.S.C. § 1983 by Defendants Race; Sampson; Naylor; Thornton and, UPD, in Violation of Cloward's Procedural Due Process Rights Under State and Federal Law)

199.         Cloward incorporates by reference and restates all preceding allegations.

28

200.        Cloward's procedural due process rights were violated where Defendants Race, Sampson, Naylor, and Thornton made provably false, and actually false, derogatory statements about him, injuring his reputation, and imposing burdens on him that significantly altered his status as a matter of state law and negatively Impacted his religious rights;

201.        As a result of falsely accusing Cloward of criminal acts involving use of a firearm, Defendants caused:

      a)  Cloward's firearms to be seized;

      b)  The revocation of Cloward's Utah-issued permit to carry concealed firearms;

      c)  A warrant to be issued for Cloward's arrest; and

      d)  Cloward's DNA to be taken and entered into state and federal databases.

202.        Defendants Race, Sampson, Naylor, and Thornton had the duty and opportunity to intervene, yet failed to intervene to prevent the false derogatory public statements, as well as the unconstitutional seizure of Cloward' s firearms, revocation of his permit to carry concealed firearms, his unconstitutional arrest and booking, and the entry of his DNA into state and federal databases. As well as causing the long-term deprivation of his property and unjustified restriction of his legal ability to purchase a replacement pistol.

20J.        Accordingly, Cloward requests relief in the form of a declaration that these Defendants violated Cloward's procedural due process rights, all damages resulting as a direct and proximate result of these Defendants' violations of Cloward' s articulated rights, costs, attorney's fees, and all other relief the Court deems just and equitable.

## FIFTH CAUSE OF ACTION

## CONSPIRACY TO DEPRIVE EQUAL PROTECTION AND CONSTITUTIONAL
## RIGHTS

(Under 42 U.S.C. §§· l·9·83 and 1985, Conspiracy by Defendants Race, Sampson, Naylor, and Thornton to Interfere with Cloward's State and Federal Rights)

204.        Cloward incorporates by reference and restates all preceding allegations.

205.        Under 42 U.S.C. § 1985, if two or more persons conspire for the purpose of depriving, either directly or indirectly, any person of the equal protection of the laws, or of equal privileges and immunities under the laws, and if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of the conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for recovery of damages occasioned by such injury or deprivation against any one or more of the conspirators.

206.        Defendants Race, Sampson, and Naylor lacked requisite suspicion to detain Cloward for investigation of a criminal offense, seize his firearms or to initiate a prosecution against him.

207.        Defendants Race, Sampson and Naylor rightly dete1mined that Cloward was justified in shooting the advancing pit bull Kovu.

208.        Defendants Race, Sampson and Naylor nonetheless insisted that Cloward provide an additional statement despite Cloward's request for counsel.

209.        In retaliation for Cloward's initial refusal to provide an additional statement, Defendants Race, Sampson, Naylor, and Thornton conspired to fabricate· and maliciously compile false allegations, pursue a meritless prosecution, unconstitutionally seize Cloward's

firearms and cause his concealed carry permit to be revoked, and to subject him to public hatred, ridicule, and contempt.

210.        Defendants Race, Sampson, Naylor, and Thornton conspired to deprive Cloward of his rights, and equal protection of those rights, under the First, Second, Fourth, Fifth, Sixth and Fourteenth amendments to the United States Constitution in retaliation for Cloward exercising his rights to remain silent during police questioning, to consult with counsel prior to making additional statements, and to protest his treatment by police.

211.        Defendant Race acted in furtherance of the conspiracy by fabricating nonetheless immaterial discrepancies between Cloward's statements to police to justify changing the determination of Cloward's conduct from justified to unjustified.

212.        These discrepancies were a mere pretext for the conspiracy to retaliate against Cloward for exercising his rights.

213.        Defendant Sampson acted in furtherance of the conspiracy by determining to seize Cloward's firearms and to cause the revocation of his concealed carry permit while enroute to the scene based on Cloward's calls to dispatch to protest his treatment by other officers, and by ratifying the determination that Cloward's conduct was unjustified rather than justified, and by threatening to take Cloward into custody if he continued to protest and did not go back into his home.

214.        Defendant Naylor acted in furtherance of the conspiracy by citing Cloward under an ordinance whose plain terms justified Cloward's conduct, and by changing his determination that Kovu's owner was at fault and by changing his determination that Cloward's conduct was justified.

215.        Defendant Thornton acted in furtherance of the conspiracy by failing to take

any action to preserve the dog. drafting a materially false and misleading probable cause statement in support of the charges against Cloward when Thornton knew or should have known that probable cause did not exist for any of the charged offenses.

216.         Defendants Race, Sampson and Naylor conspired to use Cloward's coerced additional written statement to fabricate immaterial inconsistencies as a pretext for changing their determination that Cloward's conduct was justified.

217.         Accordingly, Cloward requests relief in the form of a declaration that these Defendants violated Cloward's rights under the First, Second, Fourth, Fifth, Sixth and Fourteenth amendments; all damages resulting as a direct and proximate result of these Defendants' violations of Cloward's articulated rights; costs; attorney's fees; and all other relief the Court deems just and equitable.

## SIXTH CAUSE OF ACTION

## MUNICIPAL LIABILITY

(Under 42 U.S.C. § 1983, Unconstitutional Policy/Custom and Failure to Adequately Screen Race, and Sampson, causing Cloward's constitutional injuries against Unified Police Department)

218.         Cloward incorporates by reference and restates all preceding allegations.

219.         Upon information and belief, Unified Police Department has a longstanding, widespread, policy or practice of retaliating against citizens who insist upon exercising their rights during police encounters, as exemplified by Race and Sampson's conduct in this matter, as well as that of other officers.

220.         Upon information and belief, UPD Officer Kevin Spencer mistakenly stopped motorist Lopeti Misinale, forced Misinale out of his vehicle, handcuffed him,

verbally abused him, and ultimately released him upon realizing the mistake.

221.     After Misinale complained to UPD about Officer Spencer's misconduct, Spencer successfully induced a felony prosecution against Misinale and, when that case was dismissed, Spencer successfully induced a misdemeanor prosecution against Misinale, which was also subsequently dismissed.

222.     Upon information and belief, Spencer's unconstitutional retaliatory conduct was part of UPD's policy or custom of retaliating against citizens who exercise their rights or speak out against police misconduct, and UPD ratified this policy and custom by failing to take any adverse action against Spencer, Race, or Sampson for their retaliatory conduct.

223.     A municipality is also liable for the constitutional torts of its employee when adequate scrutiny of the employee's background would have led a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire would be the deprivation of a third party's federally protected right, and adequate screening would have shown the employee was highly likely to inflict the particular injury suffered by the plaintiff.

224.     UPD knew to a certainty that Sampson and Race had a history of falsely accusing others of misconduct, including criminal conduct.

225.     Defendant Sampson was accused by seven sworn law enforcement officers of falsifying allegations against them.

226.     Defendant Race was featured in a viral YouTube video that showed her fabricate allegations against a pedestrian after the pedestrian verbally challenged Race's false accusations and invoked his right not to answer Race's questions.

227.     Upon information and belief, UPD was aware of additional information about

33

Race's and Sampson's backgrounds that would have shown they were highly likely to inflict the particular types of rights violations Cloward suffered at their hands.

228.        Accordingly, for failure to screen Race and Sampson, and for condoning UPD's policy or custom of retaliating against citizens who exercise their constitutional rights or question police misconduct, UPD bears municipal liability for the injuries Cloward suffered as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment against Defendants as follows:

1.        A declaration that Defendants' acts and practices violated Plaintiffs' rights under the United States Constitution and under 42 U.S.C. §§ 1983 and 1985;

2.        Affirmative relief, ordering that all booking and arrest information, be removed from Cloward's record, and or any state system, and that all DNA information be destroyed and withdrawn from any state or federal database, and that Cloward is provided by the court, verification to this effect;

3.        General, special, and consequential damages in an amount to be determined at trial;

4.        Punitive damages on all claims allowed by law, in an amount to be determined     at trial.

5.     Reasonable attorney fees and the costs of litigation under subsection 1988; and All

other relief this Court deems just and equitable.

DATED: June 18, 2020.

JARDINE LAW OFFICES, P.C.

By:   /s/ Peter Goodall USB 9718
Peter Goodall
Attorney for Plaintiff

## CERTIFICATE OF DELIVERY

The undersigned hereby certifies that on June 18th, 2020, a true and correct copy of the

Second Amended Complaint was served via facsimile, United States First Class Mail, postage

prepaid, and/or the District Court's Notice of Electronic Filing system to the following:

ANDREW M. MORSE (4498)
SCOTT YOUNG (10695)
SNOW CHRISTENSEN & MARTINEAU

10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, Utah 84145-5000
Telephone: (801) 521-9000
Facsimile: (801) 363-0400
kcall@scmlaw.com
*Attorneys for Aymee Race, Jodie Sampson, D. Thornton, and Unified Police Department of Salt Lake*


Sim Gill (USB # 6389)
DISTRICT ATTORNEY FOR SALT LAKE COUNTY
William G. Garbina (USB #13960)
Deputy District Attorney
Salt Lake County District Attorney's Office
35 East 500 South
Salt Lake City, Utah 84111
Email: wgarbina@slco.org
Telephone: 385.468.7700
*Attorneys for Defendant Salt Lake County*


    /s/ Sam Jardine
Legal Assistant